Case number 15-1285, Citizens Association of Georgetown et al. petitioners v. Federal Aviation Administration et al. Mr. Adams for the petitioners, Mr. McFadden for the respondents. Mr. Adams, good morning. Good morning, Your Honor. I've heard of out-of-town counsel. You've come a long way to represent Georgetown. It's my pleasure to do so, Your Honor. I was just worried that I was going to be stuck in the meteorological events of the last few days. Good morning, and may it please the Court. My name is Matthew Adams. I represent the petitioners. This is a challenge to an FAA order that made a flight path called LASER, the default departure route for northbound aircraft from Washington National Airport. But at bottom, it's really a case about the FAA hiding the ball. Before you – your first statement deals with something I wanted to ask you about, which is what in the record – I saw your argument that the 2015 publication of the routes made LASER the default, but I couldn't find that anywhere in the record. What made that the default in 2015? Or another way to put it, why wasn't that just the natural consequences of the 2013 ROD? Your Honor, I think it was the consequence of the 2013 ROD. Oh, it was, yes. But then, is it the government right that you're out of time? That's the point of the question. Understood, Your Honor. So, let me make two points on the timing issue then. So, the first point, which is on the 60-day prong of the deadline, 46-110A. So, it is true that the document that the government calls the FONSI ROD came out in 2013. It is also true, however, that the government's decision-making process continued after that point. There was further testing. There were further adjustments. The record is not complete on that point, but we do know that that was happening with respect to, for example, a potential conflict between the LASER route and the protected area over portions of the District of Columbia. I believe the government has also mentioned that there were some changes made with respect to Runway 4 at National Airport. Didn't they just say that was just a rarely used runway? The government has... In other words, their argument is, look, these 41 routes that we published in 2015 were the exact same. Sure, they said a few names had changed, but they're the same ones that were in D.C. Metroplex. Is that not accurate? That is largely accurate, Your Honor, but they were continuing their decision-making process, so I guess our position is it had not reached its consummation yet. But you see, let's go back. Your major concern here is with the adequacy of the environmental analysis, right? And that was all done in 2013 as part of the D.C. Metroplex process. There wasn't any more environmental analysis done subsequent to that. The only thing that was being done, as I understand it, was to test these flights to see whether pilots could manage them with this next-generation navigation system without running a follow-up P-56, right? That's what that was all about. There was no more environmental, no more assessment of noise, right? Well, I think ultimately... So even if you're right that there were some changes, there weren't any legal consequences. And this is a question. What were the legal consequences that flowed from that testing that relates to your basic concern about the adequacy of the FAA's assessment of noise? That's the question. Understood, Your Honor. And that's certainly the government's position. I guess our response would be maybe the legal... It is more clear that the legal consequences came from the 2013 document, but the decision-making process had not yet been consummated at that point. And then in 2015, the decision-making process had been consummated, and so you had both prongs of the finality analysis in place. But I also want to make clear that even if the final order was the 2013 FONSI rod, we submit that our petition was timely because the filing date is supported by reasonable grounds. Well, before we get to reasonable grounds, I just have a few more questions before you get to reasonable grounds. In fact, I would say it's safe to say that in your opening brief, your whole argument rests on Order 7100.41, right? I mean, you put a great deal of weight on that. And the government's response to that is that that was promulgated after D.C. Metro Parks, so it doesn't really apply. So our response, Your Honor, is... I saw your response in the footnote, but I didn't think it was particularly responsive. Okay. Well, whether or not that particular order applies here, the decision-making process was ongoing, whether pursuant to that order or something else, and so the decision-making process had not been consummated. We would note, for example, the City of Phoenix case, where there was a discussion about when the final order was issued. And in that case, the court found that it was the publication of the routes that rendered the decision-making process final. In other words, it was when the planes started to fly them. Before that moment, the planes were not flying them, could not fly them. After that moment, the planes were flying them, did fly them, and that was the deciding factor in the Phoenix case. Now, of course, in Phoenix, the factual situation was a little bit different. And so the court in Phoenix found that the petition was untimely based on that analysis of the 60-day prong and proceeded to decide on reasonable grounds. But using that same sort of principle that the Phoenix court used, that that was really the dividing point between when the process was ongoing and when the process had concluded. In this case, we would submit that it was the publication of the routes. Yeah, but of course, I mean, you know, we're bound by Phoenix and that opinion. And I realize it came out after the briefing. But with respect to your point that the final decision wasn't made until these routes were published, Phoenix, the same thing happened in Phoenix. Phoenix, the court in Phoenix, the city of Phoenix, did say, while monitoring might lead to adjustments to the new routes, which is what may have happened here, although you and I seem to both agree there wasn't any, but there was the potential, that's your point, while monitoring might lead to adjustments to the new routes. development of those routes has already happened. That's right out of the city of Phoenix, which you could apply directly to this case. In other words, even if you're right that the 41 new procedures that were published in 2015 were adjusted, as in Phoenix, they quote, the primary development of those routes had already happened in the DC metropolis. Your Honor, there's one... That's what concerns me about your argument. Let me see if I can address that concern quickly. There's one other distinction that I should mention between the Phoenix case and this one. The FAA was able to resolve this conflict, for example, between P-56 and laser without changing laser. But that's because they went to the Secret Service and said, we would really like you to change your penalty policy. Could you tweak your approach to this so we don't have to change ours? They were successful in that regard, but if the Secret Service had said no, then the FAA would have still been in a position of having to make changes. I understand your point, Your Honor, that no changes were actually made, but there was more than a potential here. Why don't you go on? I'm sorry. Your fundamental challenge is to the no significant impact finding, right? That's what's really at the heart of this. Yes, Your Honor, we think that the environmental... That's 2013. That's right, Your Honor, it is. So the FONSI rod was December of 2013, and also the earlier, I guess it was June 2013, is the date on the draft EA. So you're right, those documents are from that time period, but we would submit that the decision-making process, sort of in a practical sense, which is the lens that, for example, Dania Beach puts on it, dictates... I mean, the problem with it, and I guess you're going to get to the second part of your argument, the problem with that is there's always after effects of the no significant impact doesn't change the deadline. Understood, Your Honor, and the only distinction I would make would be between cases where there's a finding of no significant impact and the project is immediately implemented, and cases like this one where there's a finding of no significant impact and then there's further adjustment and decision-making and then the project is implemented, you know, two years later or something like this. Your Honor raised the reasonable grounds. Yeah, why don't you go into that? Okay, Your Honor. We would point to... Let me see if I can sum this up quickly. We would point to three categories of evidence that establish reasonable grounds in our case. The first category consists of, I guess we could generally call it our exclusion from the environmental review process, and so what I'm looking at, for example, is 300 and some notices of the environmental assessment sent to folks in Virginia, Maryland, West Virginia, Pennsylvania, none to D.C. Yeah, I thought that was odd, too, but it was published in the papers and on the website, and the Supreme Court has said that's sufficient notice, right? We don't dispute that in some... Yeah, uh-huh. I'm sorry, Your Honor. No, go ahead. We don't dispute that in some circumstances sort of a website and newspaper publication might be adequate, but we would submit that more is required here for this kind of project. For example... They sent it to the congressional delegate. They did, Your Honor, but none to elected officials of the District of Columbia, I guess, and when they were distributing the EA, they sent it to... You think a notice to Eleanor Holmes Norton is not notice to D.C.? It's not notice to the elected officials of the D.C. That's a strange notion to me. All the years I've been around here, Representative Norton is a major force in D.C. There isn't much that she knows about that if it's distressing, she doesn't react to. So that's a strange argument to say that D.C. officials had no notice. She is certainly considered to be among strong D.C. officials. Your Honor, I guess we would... I certainly didn't mean to suggest anything about the representative. We would note, however, that our D.C. councilman did inquire directly while the decision-making process was open. The government points out that that request was addressed to MWA rather than the FAA. I think what my friends are missing is the fact that the response clearly says, we checked with FAA and there's nothing new since 2008, which even under the government's theory of the case would have been inaccurate. Mr. Adams, let me go back to your point about the notice, because I was troubled by that too as I read the record in the briefs here. I mean, it does seem quite odd the way the FAA handled those. So I looked for cases. I tried to find cases which suggested that even though the courts have said that public notice in the papers and on the website is sufficient, that there's some exception when the actual notice given is so distorted. But I couldn't find anything. Do you know of any authority that would allow this court to now say, well, yes, the general rule is that publication is enough, but there's something about the circumstances of this case that makes that inadequate. Do you know of anything that we could hang our head on for that? Your Honor, I would respond in two ways. The very narrowest answer to your question is I am not aware of that case, in part because I think this is such an unusual set of circumstances. This just doesn't happen. But we would point, Your Honor, to the provision of the FAA's NEPA procedures, which is referenced in our brief, I think it's Section 208, which directs the FAA to do the kind of outreach that you're talking about to the quote-unquote affected community. And we would submit that it would be appropriate to hang your hat on there to comply with its own procedures and that that would certainly be square with much NEPA case law, which generally requires agencies to follow their own regulations. You said there were two other categories of evidence. Yes. I'm sorry, Your Honor. No, that's okay. I interrupted you. What were they? So there was Councilman Evans' inquiry on this topic, specifically raising, is there anything new with northbound departures at National? When was that? That was in 2013, in October. The response came in November of 2013. So even in the FAA's theory of the case, the decision-making process was still open at that point. The FAA is correct, I think I said, that the inquiry went to EMWA and the response was on EMWA letterhead, but it also clearly said that they checked with the FAA folks at National in the response. And then the third category, Your Honor, and I'm very sorry, I see I've already run over my time. That's okay. I have another question or two. Let me ask you about the second one. Why wouldn't that argue against you if the FAA said nothing going on? In other words, we're done. We're completed. Your Honor, I apologize because I think I was a little bit too vague in my generalization of that response. The FAA did say nothing going on, but its actual words were, there is nothing new. I should be clear. EMWA said that the FAA had represented that there was nothing new since 2008. So that's what I meant in the sense of nothing going on, and I apologize. EMWA is not the FAA. That's correct, Your Honor. So is the third category of evidence the declarations about these meetings? That's right, Your Honor. Okay. So we said, this Court said in the City of Phoenix, that the touchstone of all of our cases under the reasonable grounds exception is that the agency gave the impression that they were working together to modify the problem. Right? We said that was the touchstone of all of them. So I looked at your affidavits, your declarations. Could you point to any language in the declarations that suggests that that's what happened here? No, Your Honor. And I guess our position, I should clarify, is not that we are in a situation where the FAA represented to us that they were going to fix something. In other words, it wasn't a misrepresentation about whether there was a decision-making process still open. Rather, it was a misrepresentation about whether there was a decision-making process at all. The principle is the same. We were misled into a reasonable conclusion that there was no final order for us to appeal. And that is the reasonable ground for our filing date. But you're right, Your Honor. It's not a representation of fixing something. Suppose I think, and this is just a question, suppose I think that we're bound by the case law that says public notice is enough. That is, despite the weird way in which the agency went about its notice here, that suppose I feel like we're bound by the proposition that, well, it might have been defective, but they did publish it in the Washington Post. They put it on their website. They sent it to Delegate Norton. They did all that. Does your argument then, does this other argument then fail too? Because if you had notice, legal notice, then you weren't misled about anything, right? I don't think so, Your Honor. I mean, I think there's a, if Your Honor— And you couldn't have been misled about something you didn't know about, right? I mean, it seems to me it fails either way for you. Either if you really didn't know about it, then I don't know what they, what you could have been misled about. Yeah, I mean the alleged after, if I can just add on to that, make sure I understand your argument. The alleged after the fact misleading conduct doesn't cure your prior failure to act within the deadline if the notice given was what was legally required. And so that there may be some discussions after the fact that are annoying to you in retrospect. I'm not sure, it's like, well, I don't know what to do with that as a legal matter with respect to the requirement that you act within 60 days, which you failed to do. Understood, Your Honor. If I could try and— No, that's all right, go ahead. Maybe I'll try and respond to both questions simultaneously by pointing to, again, the outreach by Councilman Evans. I mean, I will represent that we did not receive notice of the EA process. While that EA process was running, our elected representative put in an inquiry that said, are there new departure paths northbound from national? The response said, we've checked with the FAA and there's nothing new since 2008. That happened before the decision in 2013, I guess is what I'm saying. So even if you subtract the exclusion— That happened before the issuance of the ROD? That's correct, Your Honor. But it was not an inquiry of the FCC, that's the problem. Of the FAA, that's true. I mean the FAA, I'm sorry. So, Your Honor, if I could just point out one thing, and I don't mean to be dodging your question here, but it's true that it wasn't an inquiry directed by the Councilman to the FAA, but the response that came from MWA to the Councilman makes it clear that MWA directed that response to the FAA. In other words, although we didn't directly ask the FAA, the question was asked, FAA received the question, and the answer was given from FAA to MWA to the petitioners. So you're quite right as a factual matter, but we would submit that sort of the underlying principle, did we ask, did FAA answer, is still there. All right, we'll give you some time to respond. I'm sorry, Your Honor, I know I'm way over. That's okay. Mr. McFadden. Good morning, and may it please the Court. My name is Lane McFadden for the Federal Aviation Administration. In 2013, the FAA finalized and approved the D.C. Metroplex, one year after Congress enacted legislation requiring the FAA to modernize the national airspace by implementing these forms of safer and more modern procedures at the 30 or 35 busiest airports in the country. And that legislation also permitted the FAA to use an expedited form of environmental review under NEPA, but here instead the FAA published an environmental assessment and circulated it for public comment and considered those comments before issuing a final record of decision. It did all of that consistent with the regulatory procedures that guide the publication of an environmental assessment, and it insisted there would be a fulsome public process. The challengers agree that they didn't challenge that within the 60 days. They're not contesting anything you just said. They're just arguing that they didn't have adequate notice or they're entitled to this exception. They don't disagree with anything you just said. Then let's talk about reasonable grounds. Well, let me ask you a question first, before you get to reasonable grounds. So they say one of their arguments is that up until 2015, the laser procedures were optional, but in 2015 they became the default northern takeoff procedure. I guess I have two questions about that. Number one, is that right? It's not entirely right. It is true that in 2015 that is the date where most departures then started using those routes. In 2014, in the beginning of 2015, planes weren't flying that procedure yet because it was still in the process of implementation. But I do want to address what was – So would I be right to say that that was a consequence of what began in 2013? Let me ask you this. Was there any decision that the FAA made, other than its testing? What do you call the testing they did to make sure they weren't running into a P-56? They have a name for that. Whatever it is. They were testing these procedures with the new generation or next generation technology, right? Right. Okay. And your answer is, yeah, look, they finished the testing, so many more of these laser procedures were used in 2015, right? Right. Okay. But was that just as a result of the testing? Is that why? Because they discovered that the flights could be flown without running afoul of P-56? Right. Well, the testing was an important part of putting those in place. Suppose they had discovered that the pilots couldn't actually fly one of those routes that was approved in 2013 without running afoul of P-56. What would have happened? Would that flight have been not published? I'm sorry, that route? Right. It's possible it would have been not published, or it's possible it could have been changed. They could have moved the route, and in that circumstance, you would have had then a new decision by the Federal Aviation Administration, subject to its own NEPA requirements. See, that's their whole point. Their point is true. Maybe all the flights turned out to be, all 41 turned out to be manageable. In other words, they could all be flown without creating a P-56 problem. But the point is that what was done in 2015, this is their argument, I'm not saying it's right, FAA is now saying that all 41 of them are okay. So it was a decision, you're right, they didn't take any out, but the fact that they didn't take any out, they also said they're all okay. So it was a result of maybe not an active decision, but further testing. That's their point. So what's wrong with that? Well, what's wrong with that is describing them as okay. I think it's a little overgeneral for our purposes. The legal consequences relevant to the finality decision had to do with the agency's approval, the environmental approval of it under NEPA and the other laws, and that all happened in 2013. Those legal consequences were all established by that date. And I want to point out the potential for future adjustments to a procedure that ends up not working out for other reasons, like security reasons or the planes turn out not to be able to fly it, always exists in every circumstance. So it can't establish the basis for reasonable grounds for extending the statute of limitations. And then in the circumstance where the agency does make actual adjustments to the altitude or moves the path laterally, something that has some change to the environmental impacts, then you have to have a new decision before that new procedure goes into place, and the statute of limitations would start anew. Your point, though, see if I understand it, is that from an environmental point of view, these decisions were all made in 2013, right? That's exactly my point. Yes, Your Honor. And if there had been dramatic changes required by the P-56 testing, then the agency would have had to undergo another process, right? That's exactly right. Okay, what's your reaction to the argument about—I want to ask you about the notification. The agency sent this draft EA to hundreds and hundreds of institutions, right? Why dozens of libraries all over the metropolitan area but not one D.C. library? I mean, what were they thinking? Well, I mean, I have to concede right up front that was very unfortunate. We determined later it was an oversight by the contractor who used a database of county government mailing addresses. A contractor? Yes. They contract this stuff out? Most all of these NEPA documents are contracted out, yes, Your Honor. Then they're reviewed by— I take it that contractor is no longer working for the FAA? This mistake will not happen again, I can tell you that. Okay, good. But is it fatal, and why isn't it? It's not fatal, Your Honor. Tell me why. Well, in terms of the statute of limitations question, AVIA Dynamics has said that it's, quote, irrelevant whether a potential petitioner was actually notified of an agency decision. And in terms of legal notice for purposes of NEPA and the NEPA regulatory requirements for notice, the agency satisfied those requirements. The regulation, 40 CFR 1506.6, gives the agency the discretion to use a number of options. One of them is newspaper publication, which the Supreme Court said in Kossil is adequate on its own. You know, I get all that, and I ask Mr. Adams all those questions. But, you know, here we have a situation where you would be in a much better position if all you had done, if all the agency had done was publication and some minor outreach. But the outreach is so distorted. And you're right. I understand your point that the contractor messed up. But it does leave an odd impression about what the agency was trying to do here, right? Well, I understand readily why residents of Northwest DC have a bad taste in their mouth from the way this process went out. But to answer your Honor's question, I don't think that's true. I think that the additional notice to other jurisdictions by the FAA augments its compliance with its obligation. The problem you have with that argument is we can't impose procedural requirements on an agency beyond what the agency or the statute requires. But the agency can raise the standards itself. If the agency has adopted what is effectively a different and new standard, there's a serious question as to whether you can do that and exclude affected parties. That makes no sense. So we're going to allow cross-examination is not required under the statute. But we're going to have cross-examination in our procedures. But if you're from DC, you can't engage in cross-examination. That would fail arbitrary and capricious in a heartbeat. And that's essentially what they're arguing. It was the agency's decision to increase their procedural outreach, their choice. The statute didn't require it. They did it, but they excluded us. That's a compelling argument. It is, Your Honor. It's not quite analogous to the circumstances here, though. The order, the FAA order in question, addressing the agency's obligation to notify the public and engage the public, does so in general terms and doesn't include specific procedures such as you must, under all circumstances, mail to all elected officials in local communities. It does say that that's appropriate. No, no, no. If an agency, in fact, during the course of the proceedings said, you know, we're going to do this, which is beyond what we might normally require. But for this event, this is what we're going to do. We're going to have broad, broad outreach beyond just publication in the newspapers. And it's true. It's not in the statute. And we don't normally do it that way. But in this project, we are. But incidentally, not D.C. And it's no answer that the contractor didn't do it. Your Honor, if this court were to write an opinion that said that the agency's doing some additional work and doing it improperly or failing to do it well in particular circumstances. No, no, no. The agency using a disparate approach in adopting enhanced procedures. That's what we would say. Oh, that's easy to write. Don't test me there. I can write it. That's not a challenge. I'm just curious what your answer is. For purposes of NEPA, it would be illegally disparate if we had refused to accept comments from D.C. or had structured the publication in such a way so that they could not participate in the process. Well, that's their argument. Their argument is that you gave notice to most of the people who got the notice  Their representatives didn't get notice. It isn't, as a factual matter, accurate that the people who did receive notice were less affected by noise. This is a study area of four states and four major airports. There were a lot of noise concerns around. It doesn't matter. Let's assume they're all equally affected, but we're going to take out D.C. That's the question. How did that happen, you say? Where's that coming from? And if you look at it in terms of the agency has the right. We can't do it. The agency has a right under the law, they apparently felt they did, to adopt procedures even beyond those which the statute and their written regs require, and they do it. But in doing it, they say, but not D.C. Is that not overturning capricious? If they adopted a procedure for notice. They followed a procedure. I think those are legally distinct, I think, for important reasons. Well, you know, I could say and use the cross-examination example. We're not adopting that, but in the course of these hearings, we're going to follow what procedure is. If you're from D.C., you can't cross-examine. I think a judge making that requirement would be very different or an authority figure. But, again, I think you have to return to the fact that if legal notice is sufficient and comments are accepted from any interested member of the public. Obviously, someone in the agency or on behalf of the agency thought that whether or not the normal notice is sufficient, more is better, so we're going to do it. That's your problem. So the fact that it might have been sufficient in survivor review is not the question I've been struggling with. It's when an agency makes a decision, prophylactic or otherwise, either itself or on its behalf, that more is really better here. It's such an important issue, so we're going to outreach beyond what we might otherwise do. But don't do it with D.C. That's strange. It would be, I mean, it was strange, obviously, to say that. It was unfortunate, but the question is whether it violates any requirement of NEPA's notification requirements. No, that's not the question. It's an arbitrary and capricious question. You can go beyond statutory requirements unless there's something in the statute that says to the agency you cannot, and I don't see that. Then I think it's worth considering whether there was any prejudicial error that resulted from it. If you look at Appendix 4 of the Environmental Assessment, it's some 50 pages of the precise type of noise impacts at very specific addresses, including hundreds throughout D.C. That is precisely the information the petitioners have said they wanted to see analyzed as a result of implementation of these routes. And, in fact, the agency did produce that information and did disclose it publicly. And then there's been no indication that it is improperly modeled or designed, except for the question of the environmental baseline, which was resolved in the briefs. The fact is that the actual information, the environmental information sought by petitioners, is available in that document. Are you talking about the underlying evaluation of these flights? The one that said, here, let me just say, this is the EA which compared 0% laser utilization to 88%. That's the document you're talking about, right? Yes, Your Honor. Okay, but in your brief, you tell us that, quote, the input files, I take it that's what this is? You say that shows it committed no error, but then you say that the results are difficult to replicate on paper. I'm sorry. I didn't mean to say that the results were difficult to replicate. The results are replicated in the EA, but that 0% to 88% comparison is something you have to see on screen as the proprietary software models, right? Well, how can we evaluate it if we can't read it, much less the public? If Your Honor's consideration of the case turns on that, we can reproduce that model and show you some demonstratives. The problem we had in this case is that we didn't know this misunderstanding existed until the opening brief was filed. Well, but you're challenging the adequacy of the environmental assessment, and this is the basis of it, and you haven't provided it to the court in any way we can read it. Well, isn't that right? I mean, it is right. I mean, it's not like it's classified. No, but it's just – You say difficult to replicate. Is that because it's a lot of technical charts? I mean, we live and die with charts here at the D.C. Circuit. Not because you can't – What is it that we aren't able to – you can't replicate for us? Yeah, it's mostly just huge spreadsheets of certain aircraft at certain weights and certain velocities and dates and temperature variations or whatever. We could have done all that, but there was – again, we didn't know this was the specific issue that we raised until the opening brief. The petitioners got and received extra time and an extra copy of those files, you know, after they saw our response brief, and we asked them directly, do you have everything you need to look at this? Can you understand this? And we were told yes, and then the reply brief said, in fact, no. I was asking about us. Well, and again, I'm happy to volunteer some demonstrative exhibits if we want to rerun the software program, but I think this steps past something that is important to remind the Court, which is that there isn't any evidence that this was done incorrectly. The correct model that was required by law was used. The results are all produced in the EA in a form anyone can understand. You can look at the address closer to your house and see what the anticipated change in noise is and what your DNL level is. And the agency has explained precisely what process it used during the commuter modeling process, a process that this Court has repeatedly said is entitled to deference unless there are some clearly arbitrary and capricious methods in which that was employed. Can the agency action in a case like this be arbitrary and capricious, even though it's consistent with the environmental models? There's a question as to whether they've raised that claim precisely, but there certainly was final agency action in 2015. The question is, can you have a claim suggesting that what was done in 2015 was arbitrary and capricious, whether or not it fit the NEPA models? In other words, if I'm writing the brief, I say, I acknowledge we didn't meet that time limit. That's not what we're doing. This is a different final action, and we're challenging it. You're asking whether the publication of the procedures in 2015 could be arbitrary and capricious. Right. Apart from NEPA. Assuming there's some federal law to apply, the answer is yes. Well, the federal law to apply would be the APA, an arbitrary and capricious review with respect to final agency action. Right. And so then you would have to still engage in the finality question and ask what? Well, it's final. The action is final at the moment you have the publication of the routes. Right, but the publication of the routes only has very specific legal consequences. Right. The publication of the charts is information for air traffic controllers and pilots, and if there were some error there that affected some injured party, they could sue about that. But they couldn't sue and say the agency's decision years ago to approve these environmentally in its own compliance and environmental statutes is arbitrary and capricious because of the way you wrote these charts. It would be arbitrary and capricious because of the agency's NEPA document and the process it went through before the decision. I'm just asking the question, can you take it from the NEPA context and find arbitrary and capricious claims that are not about NEPA? I'm potentially injured by what the agency has done here. I don't care what NEPA says. This is going to affect me, my community, whatever, and I'm challenging. If they kept all of these routes, I understand that NEPA tentatively approved them, but I'm now challenging them on other grounds. It depends on the grounds. Obviously, the answer is yes. But if the claim is I'm affected by the noise from these aircrafts, that's a NEPA challenge. Okay. So you are saying they didn't really raise the one that I'm suggesting hypothetically? No, they certainly didn't. Their argument has always been about aircraft noise, which is exclusive. I just have one last maybe minor question. Could you say something about this letter from the NWAA? Certainly, yes. Councilman Evans wrote the airport authority, and the airport authority wrote back. And what the airport authority says it did was that it consulted historical records of flights, meaning flights before the Metroplex was in place, because obviously this preceded that decision. And then it called the air traffic control tower at National Airport and asked them, are there any construction projects that might have changed the way you're departing aircraft? And the tower said no. And that was the extent, based on the letter, which is all the evidence we have, the extent of its discussion with the FAA. So the FAA was never asked prior to the Metroplex decision, are you about to issue some sort of big decision? Are you considering changes in the future? And if so, what are they? You would need that evidence in the record to find there was some failure of notice on the part of the FAA here. Okay. Thank you. Thank you. Thank you, Your Honors. Does Mr. Adams have any time? All right. Why don't you take two minutes. Thank you, Your Honor. Let me briefly follow up on two points in the discussion just completed. So, Your Honor, Judge Tatel asked about the Supreme Court case involving the EPA and newspaper notice. And one thing I just wanted to add is the EPA, so the same agency at issue in that case, told the FAA at the beginning of this environmental review process that this was the kind of project that was sensitive enough to require public workshops, right? So newspaper and website wasn't going to be enough. They didn't say it in those words, but they encouraged the public workshops. I think that something like that can't possibly affect the legal question we have to answer here. Right? I mean, why is that relevant from the legal point of view? From the legal point of view? Yeah, from the question we have to answer. I agree with you that it makes what the FAA did even odder since they had another agency saying you needed to do more outreach. But how does that affect our application of the binding legal principles, namely that publication is sufficient? So, Your Honor, I would note that the newspaper publication case was a Clean Water Act case. What we're dealing with here is the National Environmental Policy Act, the purpose of which is different from the Clean Water Act, and the Supreme Court has said that public involvement is at the center of that purpose. NEPA provides agencies some discretion in the context of an EA, though not an EIS, about exactly how to involve the public, and that makes sense because EAs cover a very wide range of projects, right? So the public outreach used has to be appropriate to the project type. Here you have a project that, as Your Honor has pointed out, is very broad, touches on an issue of great sensitivity to the general public, and is part of a process that includes interagency interaction and comment, and you have a sister agency saying in this context, you know, we think that the outreach needs to be greater. Okay, and what's your response to what Mr. McFadden told me about the letter from MWAA? Well, we just have a fundamental difference of view on what that letter says and how it would be interpreted. Perhaps that's natural because Mr. McFadden is looking at it from the FAA's perspective, but we would submit in the context of reasonable grounds, what's important is our perspective, whether we behaved reasonably, and from that perspective, it's hard to imagine. I agree with you about that, by the way. That's exactly right. But what in the letter supports your argument that you behaved reasonably? His point is this didn't really have anything to do with noise. We would dispute that, Your Honor. It's sort of hard to imagine how someone could be concerned about departing flights from national and have it be viewed that that wasn't a question about noise. He said we checked with the tower and found out there's no construction, right? That was one thing. So, Your Honor, Councilman Evans' initial inquiry was very clearly about noise, and it asked, in the context of this noise inquiry, whether there were new flight paths or what was going on at national. And while it's true that the phrasing of the MWA letter could be interpreted, as Mr. McFadden has done, as saying the only thing that MWA asked FAA about directly was construction projects, we just don't think that's a reasonable characterization of the back and forth here. I mean, this was clearly about noise, and it was always about noise. This isn't happening in a vacuum. Noise in Northwest D.C. is an issue of great community sensitivity. Everybody knew that was an inquiry about noise issues. Your Honors, I know I'm, again, running short on time, but I just wanted to say one quick thing about Avia Dynamics, which is sort of at the core of the FAA's discussion about notice and reasonable grounds. And I would just point out that there's some very significant factual distinctions between that case and this one. So that was a case where the petitioner had actual notice of the final order within the 60-day period, didn't consult an attorney for 49 days, ended up filing in the wrong court, and at the end of the process, wound up outside the 60-day window. Its only argument in that case was, the petitioner's only argument, was that it didn't have actual notice right at the start of the 60-day window, and so that 60 days should have been told. And Judge Henderson, in your opinion, I think, said that that argument failed because, quote, we have heretofore found that reasonable grounds only in cases in which the petitioner attributes the delay to more than simply ignorance of the order. And we would submit that we have done that here. This isn't just ignorance of the order. Our elected representative inquired. There is this disparate treatment in the notice process. We are not in a situation where we're just saying, we didn't happen to get your letter in time. I know I'm over time. I apologize, Your Honors, unless there are any further questions. Thank you. Thank you, Your Honor.
judges: Henderson, Tatel, Edwards